**BLACK POLITICAL TASK FORCE et al., Plaintiffs,**

v.

**William Francis GALVIN, in His Official Capacity as Secretary of the Commonwealth of Massachusetts, et al., Defendants.**

No. CIV.A. 02–11190.

United States District Court, D. Massachusetts.

Feb. 24, 2004.

Richard W. Banka, Foley Hoag LLP, Boston, MA, for Black Political Task Force, Brenda Lopes, Carmen Pola, Carolyn Ray, Dorothea Jones, Enid Bailey, Flora J. Howard, Horace Small, Jaime Rodriguez, James E. Cofield, Jr., Lloyd King, Nancy Cook, Roscoe Morris, Willie M. Hurd, Plaintiffs.

Mary L. Cataudella, Robinson & Cole, Boston, MA, for William Francis Galvin, Defendant.

Before SELYA,* Circuit Judge, WOODLOCK and PONSOR, District Judges.

* Of the United States Court of Appeals for the First Circuit, sitting by designation.

MEMORANDUM AND ORDER

SELYA, Circuit JUDGE, sitting by designation.

In the spring of 2001, the Massachusetts legislature (the Legislature) redrew the dimensions of its House and Senate districts. The end product of that endeavor—the 2001 Redistricting Act—forms the backdrop for this litigation. The plaintiffs, African–American and Hispanic voters, complain that the redistricting scheme, as it pertains to House districts in the Boston area, infringes upon rights guaranteed to them by the United States Constitution and denies them equal opportunity "to participate in the political process and to elect representatives of their choice" in violation of section 2 of the Voting Rights Act (VRA), 42 U.S.C. § 1973(b). After careful consideration of the parties' plenitudinous submissions, we conclude that the Redistricting Act deprives African–American voters of the rights guaranteed to them by section 2 of the VRA. This conclusion renders it unnecessary to decide whether the Redistricting Act also (i) impinges upon the plaintiffs' constitutional rights, or (ii) deprives Hispanic voters of the rights guaranteed to them by section 2.[1]

We start with certain background information and then turn to the merits. At that juncture, we apply the test set forth in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), make a series of factual findings, and explain why the plaintiffs prevail on their claim that the Redistricting Act infringes upon rights protected by section 2 of the VRA. We conclude by discussing the development of an appropriate remedy.

## I. BACKGROUND

We rehearse, in broad brush, the evolution of the Redistricting Act. Thereafter, we recount the procedural history of the litigation.

### A. The Evolution of the Redistricting Act.

In the wake of the most recent decennial census, the Legislature established a joint special committee on redistricting and reapportionment (the Joint Committee) to review existing legislative districts, formulate revisions reflecting the increase in the Commonwealth's population from 6,016,425 to 6,349,097 residents, and redraw the district lines.[2] This is standard operating procedure, designed to ensure compliance with the one-person, one-vote requirement of the United States Constitution. *See Georgia v. Ashcroft,* 539 U.S. 461 n. 2, 123 S.Ct. 2498, 2516 n. 2, 156 L.Ed.2d 428 (2003) ("When the decennial census numbers are released, States must redistrict to account for any changes or shifts in population."); *Gray v. Sanders,* 372 U.S. 368, 379, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) (locating the source of the one-person, one-vote requirement in the Equal Protection Clause of the Fourteenth Amendment); *see generally Black Political Task Force v. Connolly,* 679 F.Supp. 109, 123–30 (D.Mass.1988) (three-judge court) (outlining relevant public policies vis-à-vis one-person, one-vote requirement

1. In their filings with the court, the plaintiffs pursued a theory of aggregation, namely, that African–American and Hispanic voters function in Boston as a combined cross-racial coalition with shared interests. At trial, however, the testimony concentrated on the voting patterns of African–Americans. Given our decision that the district lines must be redrawn because of the way in which the Redistricting Act treats black voters, *see* text *infra,* we need not probe the complex question of whether the plaintiffs' evidence revealed a cohesive coalition among African–American and Hispanic voters.

2. The Joint Committee was also responsible for redrawing the lines of Massachusetts's ten congressional districts. That aspect of the Joint Committee's work is not before us and we make no further mention of it.

in connection with 1987 reapportionment of Massachusetts House of Representatives). Insofar as state legislative seats were concerned, the Joint Committee functioned as an integrated body in name only: the House delegation delineated the 160 new House districts and the Senate delegation independently delineated the forty new Senate districts. This case focuses exclusively on the redistricting activities of the House delegation (the Committee).

The Speaker of the House, Thomas M. Finneran, named Representative Thomas M. Petrolati to chair the Committee. With the one-person, one-vote requirement in mind, Petrolati and his fellow Committee members determined that the ideal population for each House district was 39,682, plus or minus 5%, that is, somewhere between 37,698 and 41,666 persons. Aided by a specialized computer software program known as Maptitude, they then embarked on the task of shifting the district lines to achieve this numerical goal. The Committee (and the House as a whole) apparently was content to leave the heavy lifting to Finneran, Petrolati, their aides, and the Committee staff. Finneran and Petrolati kept the process on a short leash.[3] As it evolved, Petrolati met one by one with the other 159 members of the House to discuss their concerns. The Committee then held five public hearings at divers locations throughout the Commonwealth. Apart from these public hearings, the Committee did not meet as a body. Moreover, Petrolati neither solicited nor accepted views from community leaders.

On October 18, 2001, the Committee filed House Bill No. 4700 (the Committee Plan), which proposed 160 reshaped House districts. The accompanying report described the Committee's redistricting goals, which included complying with the one-person, one-vote requirement, ensuring contiguity and compactness, acknowledging communities of interest, and attempting to create "minority influence districts." With regard to this last goal, the report explained:

A number of [the newly proposed] districts in Boston and Springfield contain a sizable majority comprising people of color. One proposed district of Boston presently has no incumbent and is over two-thirds minority. This increased the chances of there being an additional minority House member from the City of Boston.

The Committee simultaneously wrote to House members, over Petrolati's signature, lauding the "new minority-majority district in the Roxbury section of Boston,"[4] touting the fact that it was incumbent-free, and representing that minorities composed 68% of its population.

Just four days later, the House debated the Committee Plan. Various amendments were proposed and some were incorporated into the final redistricting scheme (the Enacted Plan). Only one of these amendments is relevant here—the so-called Fitzgerald Amendment.

---

3. Although Speaker Finneran denied any involvement in the redistricting process, the circumstantial evidence strongly suggests the opposite conclusion. For one thing, he handpicked the members of the Committee and placed Petrolati at the helm. For another thing, he ensured that the Committee hired his boyhood friend and long-time political collaborator, Lawrence DiCara, as its principal functionary. Last—but far from least—

Finneran's in-house counsel, John Stefanini, had the Maptitude software installed on his computer in the Speaker's office suite and was one of only four legislative staffers who received training in how to use the software.

4. This description contained a bit of poetic license. The district in question had been a majority minority district prior to the start of the 2001 redistricting effort.

This amendment had its genesis in Representative Kevin Fitzgerald's vacillation over whether to retire from the House. When the Committee drafted its plan, it assumed that Fitzgerald had no interest in running for reelection. Consequently, it proceeded to move the residence of Representative Elizabeth Malia from her previous district (the 11th Suffolk) to Fitzgerald's home turf (the 15th Suffolk). It then made the 15th Suffolk a majority white district and retained the majority minority character of the 11th Suffolk district—the very majority minority district heralded in the Committee's report and letter of transmittal.

During the course of the floor debate, Fitzgerald (who is white) let it be known that, contrary to the Committee's assumption, he planned to run for reelection. To facilitate his candidacy, he offered an amendment that had three notable effects on the Committee Plan: it returned Malia's residence to the 11th Suffolk district, changed the contours of that district so that it would be majority white, and kept the 15th Suffolk as a majority white district in which Fitzgerald would be the lone incumbent. The House adopted this amendment, thereby eliminating the majority minority district that had been a selling point of the original Committee Plan.[5] Like the other floor amendments, the Fitzgerald Amendment was reviewed only for compliance with the one-person, one-vote requirement before being enacted.

The Senate adopted the Enacted Plan without substantive debate (we imply no criticism; the House, with equal alacrity, embraced the Senate's handiwork). On November 8, 2001, the governor signed the Redistricting Act, Chapter 125 of the Acts of 2001, into law.

## B. *The Travel of the Case.*

On June 13, 2002, African–American and Hispanic voters filed a complaint in this court challenging the Redistricting Act as it applies to House districts in the Boston area.[6] The complaint alleged that the Enacted Plan transgressed the Fourteenth and Fifteenth Amendments as well as section 2 of the VRA. The chief judge of the First Circuit convened this three-judge panel to hear and determine these claims. *See* 28 U.S.C. § 2284(a).

Pretrial discovery proved to be an intensive and demanding process, during which defense witnesses routinely invoked the protections of legislative privilege when asked about the inner workings of the redistricting process. Despite this impediment, the plaintiffs mustered a sufficient case to warrant a trial. At trial, the plaintiffs attempted to show that the Redistricting Act set the boundaries of the House districts in and around Boston in a way that impermissibly diluted the voting strength of African–Americans and Hispanics, notwithstanding the growing population of these two minority groups; that the Committee failed to provide a reasonable explanation for the lines that were

---

**5.** Irony is no stranger to the law. After upsetting the applecart, Fitzgerald performed another about-face and decided not to seek reelection. Instead, he accepted a coveted appointment as the Legislature's sergeant-at-arms.

**6.** This case concerns seventeen of the nineteen House districts in Suffolk County: the excluded districts are the 16th and 19th Suffolk districts, both of which lie wholly outside

Boston. In a separate case, *Meza v. Galvin*, Civil Action No. 02–10428 (D.Mass.), a different group of Hispanic voters filed a challenge to the Redistricting Act as it pertains to the 2d Suffolk House district, which is centered in the neighboring community of Chelsea (but which also includes the Charlestown section of Boston). The two cases were consolidated for trial. The *Meza* case will be the subject of a separate opinion.

drawn; that the Committee deviated from conventional redistricting procedures by, among other things, allowing staffers from Speaker Finneran's office to play key roles in the process and refusing to consult with minority community leaders; and that the Committee simultaneously packed minority voters into a tiny number of districts and splintered the minority vote in other (more variegated) districts in an effort to protect white incumbents.

With respect to this last point, testimony for the plaintiffs focused largely on what they described as the intentional packing of the 6th Suffolk House district and the stripping of African–American voters from the 11th, 12th, and 15th Suffolk districts. The plaintiffs emphasized that, despite the increase in Boston's minority population from 1990 to 2000 and the concomitant decrease in the white population, the Redistricting Act reduced the number of majority minority districts while increasing the number of majority white districts. They proffered two alternate redistricting schemes as potential remedies for this alleged imbalance.

Under Massachusetts law, William F. Galvin, the secretary of state, is charged with the administration and oversight of state elections. *See* Mass. Gen. Laws chs. 50–57. The plaintiffs filed their suit against several defendants, including Galvin in his official capacity. After the other defendants were dropped as a result of case management determinations, Galvin became the sole defendant. Meanwhile, Petrolati intervened and functioned as the legislative defendants' designated representative. As a practical matter, the plaintiffs' grievances are with the House leadership. Having that in mind, we henceforth will refer to Galvin and Petrolati as "the defendants."

Throughout the trial, the defendants maintained that the Enacted Plan provides African–American and Hispanic voters with equal opportunities to participate in the political process and to elect representatives of their choice. The defendants also disclaimed any intent or purpose to deny the plaintiffs equal voting opportunities on account of their race, and provided evidence indicating that incumbency protection was the driving force behind the drawing of the district lines. Finally, the defendants urged us to refrain from engaging in an unnecessary "tinkering exercise" because the Enacted Plan furnishes African–American and Hispanic voters with electoral opportunities that are no worse than "roughly proportional" to their percentage of the relevant population.

Both sides presented extensive expert testimony in support of their respective positions. Following prolific briefing and final arguments, we took the matter under advisement. This memorandum comprises our findings of fact and conclusions of law.

## II. ANALYSIS

■ Section 2 of the Voting Rights Act provides in pertinent part:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . .

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section *in that its members have less opportunity than other members of the electorate to participate in the politi-*

*cal process and to elect representatives of their choice.*

42 U.S.C. § 1973 (emphasis supplied). To prevail under this statute, plaintiffs need not establish that the Legislature acted with a discriminatory purpose; it suffices to prove that the contested standard, practice, or procedure has a discriminatory effect. *Bush v. Vera,* 517 U.S. 952, 976, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); *Gingles,* 478 U.S. at 35–36, 106 S.Ct. 2752. We caution, however, that section 2 does not turn electoral politics into an elaborate series of quotas. Despite its focus on results, the statute does not create a right to have members of a protected class actually elected in numbers equal to their proportion of the population. *Johnson v. De Grandy,* 512 U.S. 997, 1014 n. 11, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). It merely guarantees minorities a level playing field, that is, an opportunity for victory at the polls equal to the opportunity enjoyed by others. *Vecinos De Barrio Uno v. City of Holyoke,* 72 F.3d 973, 979 (1st Cir.1995).

 Although relieved of the burden of proving intentional discrimination, plaintiffs who bring section 2 challenges still face formidable hurdles. In *Gingles,* the Supreme Court limned three threshold conditions that must be fulfilled in order to mount a successful vote dilution claim. First, the plaintiffs must demonstrate that they are part of a minority group that is "sufficiently large and geographically compact to constitute a majority in a single-member district." 478 U.S. at 50, 106 S.Ct. 2752. Second, they must show that the group is "politically cohesive." *Id.* at 51, 106 S.Ct. 2752. Third, they must prove "that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Id.* (citation omitted).

Plaintiffs who satisfactorily complete this three-step pavane are not home free. *Gingles* demands a further sifting of relevant facts. This wide-ranging inquiry must dig into the totality of the circumstances, starting with the litany of factors delineated in the Senate report that accompanied passage of the 1982 amendments to section 2. *Id.* at 43–46, 106 S.Ct. 2752. The list includes (i) the extent of any history of official discrimination at the polls in the relevant jurisdiction; (ii) the frequency with which members of the minority group have been elected to public office in that jurisdiction; (iii) the presence of voting practices or procedures that stand as obstacles to minority participation; (iv) the extent to which members of the minority group must endure the effects of discrimination in such fields as education, employment, and health care; (v) the level of responsiveness exhibited by elected officials vis-à-vis the particular needs of the minority group; and (vi) the magnitude of racially polarized voting within the relevant jurisdiction. *See* S.Rep. No. 97–417, at 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07.

Comprehensive as this compendium may appear, it is not exclusive; other factors may be equally instructive in particular cases. One such factor is proportionality—the relationship between the number of majority minority voting districts and the minority group's share of the relevant population. *De Grandy,* 512 U.S. at 1000, 1014 n. 11, 114 S.Ct. 2647. Another is related to causation—the extent to which influences apart from racial bias may have caused the white bloc voting identified by the third prong of the *Gingles* formulation. *See Vecinos,* 72 F.3d at 983 & n. 4 (noting that other possible influences may include "organizational disarray, lack of funds, want of campaign experience, the unattractiveness of particular candidates, or the universal popularity of an opponent").

■ When all is said and done, the critical issue in a vote dilution case is whether the challenged districting scheme deprives minority voters of an equal opportunity to participate in the electoral process and to elect candidates of their choice. *Id.* at 980. In the pages that follow, we conduct our assessment of the plaintiffs' case, using the *Gingles* framework.

### A. *Numerosity.*

The overarching purpose of the first *Gingles* precondition is to ensure that, in the absence of the challenged practice, procedure, or structure, the minority group would have the potential to elect a representative of its choice in the relevant political subdivision. *See Growe v. Emison,* 507 U.S. 25, 40, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (extending the *Gingles* rubric to single-member districts); *see also Gingles,* 478 U.S. at 50 n. 17, 106 S.Ct. 2752 (observing that without this showing, the plaintiffs cannot claim to have been injured by the challenged practice, procedure, or structure). In a vote dilution case, this showing requires the plaintiffs to demonstrate that an effective and feasible remedy exists. Typically, this demonstration is accomplished by proffering an alternative plan that contains more than the existing number of reasonably compact districts with minority populations large enough to elect minority-preferred candidates. *See, e.g., De Grandy,* 512 U.S. at 1008, 114 S.Ct. 2647. An inquiring court normally will use the plaintiffs' alternative plan as a benchmark against which to take the measure of the challenged scheme. *See Holder v. Hall,* 512 U.S. 874, 880, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994).

At first blush, this aspect of the *Gingles* test seems fairly straightforward. Appearances can be deceiving, however, and courts have struggled with a host of complexities implicated by its formulation. Although we need not catalogue all of these complexities, a few of them are of particular pertinence here, and, thus, deserve further elaboration.

We note, first, that the Supreme Court has explicitly declined to resolve whether plaintiffs may satisfy the first prong of *Gingles* with evidence that the minority group, although not comprising an absolute majority of the population within a given district, nevertheless wields enough influence that it usually will be able to elect candidates of its choice with the help of crossover votes. *See, e.g., De Grandy,* 512 U.S. at 1008–09, 114 S.Ct. 2647 (leaving this question open); *Voinovich v. Quilter,* 507 U.S. 146, 154, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (same); *Growe,* 507 U.S. at 41 n. 5, 113 S.Ct. 1075 (same). Because this issue is not outcome-determinative in this case, we assume, arguendo, the correctness of the bright-line rule followed by most courts: a minority population is sufficiently large to constitute a "majority" for the purposes of the first *Gingles* precondition only if it comprises more than 50% of the relevant population in the affected district. *See, e.g., Valdespino v. Alamo Heights Indep. Sch. Dist.,* 168 F.3d 848, 852–53 (5th Cir.1999); *Cousin v. Sundquist,* 145 F.3d 818, 828–29 (6th Cir. 1998); *McNeil v. Springfield Park Dist.,* 851 F.2d 937, 943–45 (7th Cir.1988); *Parker v. Ohio,* 263 F.Supp.2d 1100, 1104–05 (S.D.Ohio) (three-judge court), *aff'd mem.,* — U.S. ——, 124 S.Ct. 574, 157 L.Ed.2d 426 (2003).

This does not mean that the existence of such "influence" or "crossover" districts is entirely inconsequential to the case; they are relevant in assessing the totality of the circumstances, *see Vecinos,* 72 F.3d at 979 n. 2, 990–91, and we shall return to them in that setting. However, we reject the defendants' effort to use influence or crossover districts as a means of undercutting the plaintiffs' showing on the first *Gingles* precondition (by, for example,

pointing to districts with African–American populations just under the 50% line to boost the number of "effective" majority minority districts created by the Enacted Plan). These concerns are adequately accounted for not only in addressing the totality of the circumstances but also in the analysis required by the third *Gingles* precondition. After all, if African–American voters are in fact able to convert influence or crossover districts into "effective" majority minority districts, this circumstance should result in the plaintiffs' failure to prove that majority white bloc voting regularly operates to defeat the preferred candidate of African–American voters.

A second unresolved issue is whether, in determining the size of the minority group in a particular district, a court should concern itself with the percentage of the minority population that is simply of voting age (VAP) or the percentage of the minority population that is composed of *citizens* who are of voting age (CVAP). To date, the Supreme Court has refrained from choosing between these indices. *See De Grandy,* 512 U.S. at 1021 n. 18, 1023, 114 S.Ct. 2647 (forgoing a decision between VAP and CVAP in assessing proportionality, but using VAP figures); *cf. Growe,* 507 U.S. at 38 n. 4, 113 S.Ct. 1075 (declining to choose between total population and VAP). Although the First Circuit has not spoken directly to the point, other courts of appeals lately have tended to support the use of CVAP data, at least when that data is readily available and its use is not contraindicated by other circumstances. *See, e.g., Perez v. Pasadena Indep. Sch. Dist.,* 165 F.3d 368, 372 (5th Cir.1999); *Negrón v. City of Miami Beach,* 113 F.3d 1563, 1568–69 (11th Cir.1997); *see also Barnett v. City of Chicago,* 141 F.3d 699,

704–05 (7th Cir.1998) (stating, in dictum, that CVAP is the proper yardstick for measuring proportionality in a section 2 vote dilution case).

■ The cardinal purpose of the first *Gingles* precondition is to determine whether minority *voters* have the potential to elect preferred candidates. *See Gingles,* 478 U.S. at 50 n. 17, 106 S.Ct. 2752 (referring to the potential *of minority voters* to elect representatives). Because non-citizens cannot vote (or even register to vote), the use of CVAP data, when and where available, seems more concinnous than the use of VAP data. Here, however, we need not make a definitive choice. For one thing, no one has pointed to any material differences in the available VAP and CVAP figures for African–Americans in Boston and, according to the defendants' expert, non-Hispanic whites and non-Hispanic blacks register to vote at similar rates (56% and 57% of the voting age population, respectively). For another thing, VAP figures may be unreliable when analyzing Hispanic populations, where there are greater numbers of recent immigrants, *see Negrón,* 113 F.3d at 1568, but there is no serious reason to believe that they are less reliable when analyzing African–American populations.[7] Then, too, the Legislature used only VAP data in drawing the Enacted Plan, and the parties have provided only VAP data for certain analyses (e.g., the second and third *Gingles* preconditions). For these reasons, we employ VAP data in our ensuing analyses. We note, however, that we would reach the same result vis-à-vis the first *Gingles* precondition utilizing either set of data (VAP or CVAP).

---

7. While well over 50% of African–Americans register to vote, *see* text *supra,* only 20% of the total Hispanic VAP in Boston is estimated to be registered. The difference in these numbers is quite likely attributable to the relatively greater non-citizenship rates of Hispanics as compared to African–Americans.

■ A third unresolved issue concerns the appropriate method of characterizing voters as members of a particular race. Unlike previous censuses, the 2000 census permitted interviewees to identify themselves as members of more than one race. This means that there are now two different methods for assigning persons to racial groups. Under the first method—referred to as the "alone" method—a person who has identified himself or herself only as "black" will be counted as black, but a person who has checked both the box for "black" and the box for, say, "Asian" will be counted only as multiracial. Under the second method—referred to as the "combined" or "combo" method—a person who has identified himself or herself as a member of more than one race will be counted in every such category (in our earlier example, the responder will be counted as both black and Asian). The plaintiffs urge us to use the alone method because it avoids an overcount (by placing an individual voter in two or more racial categories, the combo method results in totals exceeding 100% of actual responders) while the defendants urge us to use the combo method because it is more comprehensive in its representation of voter identities (it places in any given racial category everyone who considers himself or herself a member of that race). This is a recent development in election law and the jurisprudence is embryonic. The Supreme Court appears to have employed combo (or combo-like) data in *Georgia v. Ashcroft,* 123 S.Ct. at 2507 n. 1, but it did so with regard to a section 5 preclearance claim, not a section 2 vote dilution claim, and we regard the question as open. Indeed, there may well be no single rule; context and the availability of data may determine which method best reflects the realities of a specific situation.

In all events, the circumstances of this case render it unnecessary to choose one method over the other. As the defense acknowledged, through its expert witness and in its trial brief, there are no great differences in this case between the two data sets, at least insofar as the second and third *Gingles* preconditions are concerned.[8] Accordingly, we will provide both sets of data with respect to the first *Gingles* precondition in order to demonstrate that the choice is not outcome-determinative. As for the remaining *Gingles* preconditions and the totality of the circumstances, we will use an admixture of alone and combo data, determined primarily by the form in which the parties have furnished relevant data to us.

We turn now to the proof on the first *Gingles* precondition. At trial, the plaintiffs established that the African–American population in Suffolk County—which encompasses all of the city of Boston and a few environs—is sufficiently large and compact to allow for the creation of more majority black districts than currently exist. Using the alone method, the Enacted Plan provides for one majority black district in Suffolk County (the 6th) whereas Plan No. 2—which we deem to be the more useful of the plaintiffs' two submissions—provides for two majority black districts (the 6th and the 12th). Using the combo method, the Enacted Plan provides for three majority black districts in Suffolk County (the 5th, 6th, and 12th) whereas Plan No. 2 provides for the same three majority black districts plus a fourth (the 11th).

8. For example, the defendants' principal expert stated at trial that "essentially the estimates—[the plaintiffs' expert's] and mine—came out in terms of they're in the same ball park" despite the fact that the plaintiffs' expert used the alone method and he (the defendants' expert) used the combo method. He concluded that, as applied in this case, the two methods yield "no great distinctive differences."

We enumerate the specifics needed to support these conclusions in Appendix A (attached hereto and incorporated by reference herein). We note, moreover, that the plaintiffs would be equally successful in proving the first *Gingles* precondition if we were to use CVAP data instead of VAP data. *See* Appendix B (attached hereto and incorporated by reference herein). To cinch matters, the districts illumined in Plan No. 2 are compact, meet applicable standards of contiguity, and comply fully with the one-person, one-vote requirement.

The defendants' counter-arguments are unpersuasive. First, they insist that the proper benchmark for the first *Gingles* precondition is the plan initially offered by the plaintiffs (the so-called Harmon Plan), not Plan No. 2. In this respect, the defendants lament that they first became aware of Plan No. 2 after the close of discovery. They add that they received critical documents relating to this new plan only two weeks before trial began.

Their argument is unconvincing. In the first place, the defendants have shown no unfair surprise; Plan No. 2 is simply a new iteration of data long in the defendants' possession. Perhaps more importantly, in requiring plaintiffs "to demonstrate that [the minority group] is sufficiently large and geographically compact to constitute a majority in a single-member district," *Gingles,* 478 U.S. at 50, 106 S.Ct. 2752, the Court focused on the potential of minority voters to elect representatives of their choice in some hypothetical district, *see Vecinos,* 72 F.3d at 979. While plaintiffs must offer an alternative plan, they may do so, with leave of the court, at any time up to the end of trial. *Cf. Barnett,* 141 F.3d at 702 ("The plaintiff is not required to propose an alternative map that is 'final' in the 'final offer' arbitration sense, where the parties cannot modify their offers once they have denominated them final . . . ."). Had the defendants so desired, they too could have processed the census data and discovered, early in the redistricting effort, the possibility of creating an additional majority black district.

The defendants' second counter-argument attacks Plan No. 2 frontally. This plan, the defendants aver, fails to show that African–American voting opportunities would be "significantly diminished" if the Enacted Plan were to remain in effect. Since two of the majority black districts configured by Plan No. 2 fall just over the 50% mark (at least when one uses VAP data and the combo method) and one of the Enacted Plan's districts falls slightly under that mark (42.59%, using the same data and method), they asseverate that Plan No. 2 does precious little to enhance African–American voting opportunities in Suffolk County.

We reject this reasoning. Even were we prepared to indulge the defendants' ipse dixit that 42.59% is "only somewhat under the line," the defendants' argument overlooks that neither the Supreme Court nor the First Circuit has held that the first *Gingles* precondition is concerned with districts that fall under the 50% majority minority cutoff point. Moreover, the *Gingles* line of cases only requires plaintiffs to show the feasibility of one additional majority minority district. *See Vecinos,* 72 F.3d at 985–86. The plaintiffs have cleared that hurdle here. We find, therefore, that the plaintiffs have carried the devoir of persuasion with regard to the first prong of *Gingles.*

## B. *Cohesiveness and Bloc Voting.*

The second and third *Gingles* preconditions demand slightly different analyses of substantially similar data. For that reason, we think it convenient to discuss them together. We remain aware, however, that each of the two inquiries serves a distinct purpose.

■ The second *Gingles* precondition focuses on cohesiveness. It measures the potential of minority voters to elect representatives of their choice were they presented with an ideally configured district. The premise is that unless a minority group is politically cohesive, it will not have the voting strength necessary to achieve electoral success, notwithstanding favorable numbers. *See Growe,* 507 U.S. at 40–41, 113 S.Ct. 1075; *Gingles,* 478 U.S. at 51, 106 S.Ct. 2752.

■ The third *Gingles* precondition focuses on majoritarian bloc voting. It delves into the cause of minority voters' lack of success in existing districts. The premise is that if a majority group votes sufficiently as a bloc to enable it to impose its will and defeat minority-preferred candidates most of the time, the challenged practice, procedure, or structure is likely to be a cause of the minority group's impotence at the polls. *See Growe,* 507 U.S. at 40–41, 113 S.Ct. 1075; *Gingles,* 478 U.S. at 51, 106 S.Ct. 2752.

To satisfy the second and third preconditions, plaintiffs typically offer statistical evidence detailing the voting patterns of racial groups in past elections. True to this profile, the plaintiffs' expert, Dr. Richard Engstrom, presented the results of his analysis of four Boston City Council elections, one city-wide district attorney election, and two Democratic primaries for House seats. The defendants countered with the testimony of Dr. Harold Stanley, who undertook to analyze the results of several House races (involving a mix of primary and general election match-ups) and one city-wide district attorney contest. We found both experts knowledgeable and both used accepted analytic tools, such as regression and homogeneous precinct analyses. *See Gingles,* 478 U.S. at 52–53, 106 S.Ct. 2752 (endorsing both of these analytic approaches). Dr. Engstrom also employed a third methodology, known as eco-

logical inference—but we have chosen to focus our attention on the two more conventional types of analysis.

Under the best of circumstances, combing through columns of statistical data is a daunting task for those of us untrained in the finer points of an admittedly arcane science. Maintaining a focus on the inquiries posed by the second and third *Gingles* preconditions makes the task more manageable.

Refined to bare essence, the second precondition (political cohesion) asks whether the electoral data exhibits clear voting preferences on the part of the minority group (here, African–Americans). *Id.* at 56, 106 S.Ct. 2752 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim . . . ."). The third precondition (white bloc voting) requires a four-step inquiry: a court must (i) identify the candidates most preferred by the minority group; (ii) observe whether the white majority votes as a bloc for other candidates; (iii) determine whether the white bloc vote is of a magnitude that usually suffices to defeat minority-preferred candidates; and (iv) assess whether any of the electoral results should be discounted because of special circumstances. *Id.* at 56–57, 106 S.Ct. 2752; *cf. Jenkins v. Manning,* 116 F.3d 685, 691 (3d Cir.1997) (outlining a similar inquiry but dividing it into three, rather than four, parts).

Although the bulk of the analysis necessarily functions at the level of individual elections, courts must be careful not to become preoccupied with the trees and thereby lose sight of the forest. The ultimate answer to the question of whether racially polarized voting exists to a significant degree will crystallize only after the court steps back to view the landscape as a

whole. Although the number of elections that must be studied will vary from case to case, the Supreme Court has cautioned that a pattern of polarized voting extending over a period of time is customarily more probative than the results of any single election. *Gingles,* 478 U.S. at 57 & n. 25, 106 S.Ct. 2752; *accord Vecinos,* 72 F.3d at 984 (explaining the need to examine voting practices over time because "[i]n this enlightened day and age, bigots rarely advertise an intention to engage in race-conscious politics"). Above all, an inquiring court should resist the temptation to confine itself to raw numbers in a particular election, instead endeavoring to make a practical, commonsense appraisal of all the evidence. *Vecinos,* 72 F.3d at 989. With these precepts in mind, we begin our evaluation of the data.

■ **1. The Multi–Race Endogenous Elections.** After having conducted an exhaustive review of the case law and the circumstances of this litigation, we conclude that the most probative elections for our purposes are likely to be multi-race endogenous elections. By multi-race, we mean those elections in which at least one white candidate vied for office against at least one African–American candidate. By endogenous, we mean House elections in the seventeen affected Suffolk County districts.

Our decision to accord more weight to multi-race elections is supported not only by common sense but also by the case law. *See Rural West Tenn. African American–Affairs Council v. Sundquist,* 209 F.3d 835, 840–41 (6th Cir.2000) (approving a decision to accord greater weight to results of black-versus-white elections); *Jenkins,* 116 F.3d at 692, 694–95 (affirming a

decision to discount same-race elections); *Westwego Citizens for Better Gov't v. City of Westwego,* 872 F.2d 1201, 1208 n. 7 (5th Cir.1989) ("[T]he evidence most probative of racially polarized voting must be drawn from elections including both black and white candidates."); *see generally Vecinos,* 72 F.3d at 988 n. 8 ("[E]lections in which minority candidates run are often especially probative on the issue of racial bloc voting."). We understand that black voters sometimes may consider a white candidate their representative of choice and vice-versa. If no candidate of the voter's race is in the field, however, that support may well represent something less than a true preference. *Cf. Gingles,* 478 U.S. at 68, 106 S.Ct. 2752 (plurality op.) (stating, as a fact, "that race of voter and race of candidate is often correlated"). Indeed, the choice presented to minority voters in an election contested only by two white candidates is somewhat akin to offering ice cream to the public in any flavor, as long as it is pistachio.

The VRA focuses on the opportunity of minority voters to elect representatives of their choice, and we believe that this opportunity is best and most easily measured in elections that offer black voters the chance to support a viable black candidate against a viable white candidate.[9] *See Sanchez v. Colorado,* 97 F.3d 1303, 1317 n. 24 (10th Cir.1996). At the same time, we recognize the obvious: in most instances, the best indicator of how voting operates in a particular type of election is how voting historically has operated in that type of election. *See Rural West Tenn.,* 209 F.3d at 841; *Johnson v. Hamrick,* 196 F.3d 1216, 1222 (11th Cir.1999); *see also Vecinos,* 72 F.3d at 990 (suggesting that, in

**9.** We have, of course, reviewed all the elections analyzed by the experts. While we find same-race elections, overall, less probative, we do glean some insights from them. *See infra* Part II(B)(3)-(4). Furthermore, the

black-versus-black races are probative of black candidate success (and, thus, relevant in a consideration of the totality of the circumstances). *See Jenkins,* 116 F.3d at 694.

general, endogenous elections are more probative than exogenous elections). Consequently, we focus initially on multi-race endogenous elections.

We commence our canvass of this electoral subset with the 1994 Democratic primary election in what was then the 5th Suffolk House district. The evidence shows that black voters preferred the black candidate (Golar–Richie) while white voters preferred the white candidate (Roman). Golar–Richie prevailed. On these facts, it appears that racially polarized voting existed, but that white bloc voting lacked the muscle to defeat the black-preferred candidate.

In a typical district, these results would supply evidence tending to establish the second *Gingles* precondition and to defeat the third. But the 5th Suffolk, as it existed in 1994, was not a typical district. Rather, it was a majority black district in which African–Americans comprised 50.87% of the VAP (based on 1990 census figures). This constitutes a special circumstance that robs the election of any probative force with respect to the third *Gingles* precondition. After all, it should come as no surprise that a black-preferred candidate was successful in · a majority black district with racially polarized voting, which is why *Gingles*'s third prong directs the court's attention to those districts in which there is a white majority. *See Gingles*, 478 U.S. at 51, 106 S.Ct. 2752; *see also Growe*, 507 U.S. at 40, 113 S.Ct. 1075 (explaining that a showing of white bloc voting is "needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population"); *cf. De Grandy*, 512 U.S. at 1003–04, 114 S.Ct. 2647 (indicating that standard bloc-voting analysis must give way "in a district where a given minority makes up a voting majority").

In sum, we believe that the results of this election support the plaintiffs' allega-tion that African–Americans in Boston are politically cohesive without in any way contradicting their allegation that white bloc voting usually serves to defeat black-preferred candidates in majority white districts. *See Old Person v. Cooney*, 230 F.3d 1113, 1122 (9th Cir.2000) (concluding that a district court ·erred in drawing "no distinction between jurisdictions in which Indian voters constitute a majority of the voting age population, and those jurisdictions in which white voters were in the majority" while analyzing the third *Gingles* precondition).

We turn next to the 1996 Democratic primary election in the same district. This election was largely a reprise of the 1994 primary. African–American voters preferred Golar–Richie, white voters preferred Roman, and Golar–Richie won. For the reasons explicated above, we conclude that these results constitute evidence of political cohesiveness among African–American voters, but do not speak to the existence *vel non* of legally significant white bloc voting.

The 2002 general election for the House seat in the 5th Suffolk district pitted a black candidate (St.Fleur) against a white candidate (Chaparro). In this election, both black and white voters favored St. Fleur (who ran on the Democratic ticket) over Chaparro (who ran as an independent).

Here, too, we are satisfied that special circumstances explain the success of the black-preferred candidate (and, therefore, that the results of this election have scant probative value). The reasoning that led us to discount the prior two elections does not apply to this contest. The election occurred in 2002 and the Enacted Plan had revised the district lines. As such, the district had 49.73% black VAP on the alone method and a 55.93% black VAP on the combo method. Although these estimates

leave us uncertain whether the district fairly can be characterized as a majority black district, the political climate in Boston—an area in which the vast majority of citizens vote Democrat—makes general election results unreliable barometers of the second and third *Gingles* preconditions. Based on election statistics compiled by the Elections Division of the Office of the Massachusetts Secretary of State, we take judicial notice, Fed.R.Evid. 201, of the fact that no Republican, independent, or third-party candidate has been elected to the House from a representative district wholly or partly within Boston since 1992. Prior to the election of Representative Althea Garrison in that year, none had been elected since 1970. Because political allegiance can be a tie that binds every bit as much as race, a determination that black and white voters in Boston preferred the Democratic candidate at a general election is hardly news. In our estimation, that fact says less about race than about partisan politics.

The relationship between race and party politics is a complicated matter and the removal of partisanship from the equation helps to isolate race for purposes of a vote dilution inquiry. *See Sanchez,* 97 F.3d at 1317 n. 25 (noting that analysis of Democratic primary elections helps counter the argument that, in a heavily Republican district, "Hispanics don't lose elections, Democrats do"). For this reason, we deem the results of this election unilluminating.

This brings us to the 1998 House primary in the 9th Suffolk district. In this race, two white candidates (Branson and Walsh) ran against an African–American candidate (Rushing). Rushing proved to be the preferred candidate of both black and white voters. The rub, however, is that by the time of the 1998 primary, Rushing was an eight-term incumbent who had served in the House for sixteen years.

Incumbency is a special circumstance that must be weighed, sometimes heavily, in assaying the probative value of election results. *See Gingles,* 478 U.S. at 60, 106 S.Ct. 2752; *Old Person v. Brown,* 312 F.3d 1036, 1048 n. 13 (9th Cir.2002), *cert. denied,* —— U.S. ——, 124 S.Ct. 566, 157 L.Ed.2d 429 (2003). Consequently, we decline the defendants' invitation to treat this election as disproving the plaintiffs' allegation that legally significant white bloc voting exists in Boston.

The 2000 general election in the same House district is no more helpful. Both black and white voters preferred the black incumbent, Rushing, who won over his white opponent (Ashcroft) in a landslide. We discount this result both because of Rushing's long-time incumbency and because he had the Democratic nomination (Ashcroft ran as a Libertarian).

In 2002, there were three candidates in the Democratic primary in the 11th Suffolk House district. Two were white (Malia and McLaughlin) and one was black (Payne–Thompson). The statistical evidence satisfies us that Malia, who won the election, was the preferred candidate of white voters. The record is tenebrous, however, as to which candidate African–American voters preferred because the best available regression analysis produced a negative roll-on. A roll-on is the percentage of a particular group's voters estimated to have cast a ballot in the contest. A negative roll-on shows that voters in the studied subgroup chose, in large numbers, not to vote for any candidate in the election in question. Thus, a negative roll-on is a powerful indicator that no candidate in the race was that subgroup's candidate of choice. Given the negative roll-on for African–Americans here, we conclude that this factor renders unreliable the estimates of how black votes were cast.

In 1990, two white candidates (Finneran and Bennett) ran against a black candidate (Johnson) in the Democratic primary for the House seat in the 12th Suffolk district. Both white and black voters preferred Finneran—a legendary political powerhouse who became Speaker of the House of Representatives a few years later. Although the election results tend to argue against racial polarization, they constitute rather weak proof in the circumstances of this case.

The final election in this grouping is the 2002 general election in the 15th Suffolk House district. This three-way race involved an Hispanic candidate (Sanchez—who had the Democratic endorsement), a black candidate (Chidi, who ran as an independent), and a white candidate (Clifford, who also ran as an independent). Although white voters preferred Sanchez, we cannot draw any reliable conclusions from these results because regression analysis produced a negative roll-on estimate for the African–American vote.

This concludes our survey of the results of the multi-race endogenous elections. For our purposes, the 1994 and 1996 primary elections in the former 5th Suffolk House district tend to prove that African–Americans vote as a politically cohesive group. Apart from that, the results are largely uninformative. Accordingly, we find it necessary to turn to multi-race exogenous elections as the next best available source of evidence to help us discern whether a pattern of racially polarized voting exists in Boston.

2. *Multi–Race Exogenous Elections.* In the absence of a sufficient number of useful multi-race endogenous elections, the next most fertile field is composed of multi-race exogenous elections. By this, we mean those elections in which at least one

black candidate competed against at least one white candidate for an elected office (other than a House seat) in the general geographic area involved in the plaintiffs' vote dilution challenge. Courts, as a matter of discretion, have the authority to consider exogenous elections when faced with a paucity of meaningful endogenous elections. *See, e.g., NAACP v. Fordice,* 252 F.3d 361, 370–71 (5th Cir.2001); *Askew v. City of Rome,* 127 F.3d 1355, 1381 n. 13 (11th Cir.1997) (per curiam); *Cano v. Davis,* 211 F.Supp.2d 1208, 1235 (C.D.Cal. 2002) (three-judge court) (per curiam). They must, however, furnish explanations for why particular exogenous elections reveal reliable information about relevant voting patterns. *Vecinos,* 72 F.3d at 990.

The affected area here is Suffolk County (and, in particular, Boston). The plaintiffs urge us to consider several exogenous elections as evidence of African–American political cohesion and white bloc voting. Specifically, they point to four at-large Boston City Council elections and one race for Suffolk County district attorney.

The defendants argue strenuously against consideration of these exogenous elections. They contend that the different circumstances surrounding the elections render the retrieved data of dubious value in a vote dilution case designed to test the composition of the House of Representatives.

This argument has a patina of plausibility. The dynamics of the proffered exogenous elections are somewhat different than those of House elections. For instance, Boston City Council elections are non-partisan, certain candidates run city-wide for four at-large seats instead of district by district, and each voter may cast up to four votes for those seats.[10] The Suffolk Coun-

---

10. Some councilmanic candidates represent specific districts. None of the experts who testified in this case submitted any figures for councilmanic district elections, so we concentrate exclusively on the at-large election results.

ty district attorney election also differs from a prototypical House election. Although that election is partisan and involves only a single vote for a single office, the political subdivision is slightly different; whereas the plaintiffs' vote dilution claim concentrates on those House districts that lie at least partly within the city of Boston, the district attorney election involves votes from all over Suffolk County (a region that includes Boston, Chelsea, Revere, and Winthrop, and, more to the point, includes two Suffolk County House districts that are not within the scope of the plaintiffs' challenge). The district attorney election is also different in that it does not include votes from Milton (although Milton is in Norfolk County, the Committee tacked several precincts from that community onto Speaker Finneran's 12th Suffolk district). And, finally, all of the exogenous elections that the plaintiffs urge us to consider may differ from House elections in terms of more amorphous factors (e.g., the importance that voters assign to the office or the campaign strategy that a candidate is likely to employ).

In the end, however, we think that the similarities between the proffered exogenous elections and the elections at issue in this case are sufficiently compelling to outweigh the differences. Both sets of elections are for offices with comparable levels of importance within the community. They concern much the same constituencies, and we believe that there is a considerable measure of truth in Dr. Engstrom's observation that racially polarized voting rarely stops at electoral borders. Thus, we are confident that an in-depth consideration of the multi-race exogenous elections may allow us to glean meaningful insights into the voting patterns and preferences of Boston-area residents. We turn, then, to those elections. As we do so, we note that although the defendants have scoffed at the probative value of these elections, they have not seriously questioned the accuracy or integrity of the plaintiffs' regression analysis.

We begin with the 1995 councilmanic election. There, a black candidate (Jones) and seven white candidates competed for four at-large seats. Jones received over 81% of the black vote,[11] and the correlation coefficients indicate political cohesion among African–American voters. However, Jones received only 20% of the non-minority vote [12] and he failed to win a seat. In our judgment, the results of this election—Jones ranked first among black voters but last among white voters—evince both a pattern of cohesive black voting and a pattern of majoritarian bloc voting sufficiently strong to defeat the black-preferred candidate.

The results of the 1997 councilmanic election reinforce these findings. There, a lone black candidate (Jones) faced seven white candidates in a race for four available seats. Jones received 88.5% of the black vote and was the most prolific vote-getter in that segment of the community. Not surprisingly, the correlation coefficients once again indicate political cohesion among African–American voters. Jones nonetheless failed to finish in the top four (and, hence, lost the election), receiving only 27.8% of the non-minority vote (rank-

---

11. Although Dr. Engstrom provided both bivariate and multivariate regression estimates for each candidate, we will use only the latter. This decision allows us to use the best available approximation of the white vote. In any event, the differences between the estimates are insignificant.

12. The term "non-minority" is a bit of a misnomer because this category excludes only African–Americans and Hispanics, and, thus, includes not only whites but also small minority groups (such as Native Americans and Asian–Americans). It is, however, a reasonably accurate approximation of the white vote.

ing as the sixth most popular candidate among non-minority voters). We find that this election provides additional evidence of both cohesive African–American voting and majoritarian bloc voting powerful enough to defeat a black-preferred candidate.

The results of the 2002 election for Suffolk County district attorney militate in the plaintiffs' favor. In this contest, a black candidate (Jenkins) ran against a white candidate (Conley).[13] Jenkins received 99.6% of all African–American votes and the correlation coefficients indicate a very high degree of political cohesion among African–American voters. Jenkins nonetheless failed to win election because he received only 22.1% of the non-African-American vote.[14] The results of this election exhibit both African–American cohesiveness and white bloc voting sufficiently staunch to defeat the black-preferred candidate. We give diminished weight to the indication of legally significant white bloc voting, however, as Conley ran as an incumbent (he had been appointed to fill a vacancy) and carried the Democratic party's endorsement. As we already have explained, see supra Part II(B)(1), the Democratic imprimatur has been a salient factor in general elections held within Suffolk County. Incumbency, too, usually helps to propel a candidacy.

We also have examined the results of two multi-race exogenous elections touted by the defendants: the 2003 councilmanic election and the 1994 election for Suffolk County district attorney. The first of these witnessed two black candidates, an Hispanic candidate, and five white candidates vying for four at-large city council seats. The Hispanic candidate (Arroyo) was elected with 76.1% of the black vote and 38.4% of the non-minority vote, ranking him first among black voters and fifth among non-minority voters. The correlation coefficients for this election indicate the presence of political cohesion among black voters. The white vote, however, was sufficiently scattered that it did not operate to defeat the black-preferred candidate. Therefore, the election hints at the absence of legally significant white bloc voting (and, to that extent, cuts in the defendants' favor).

The 1994 Suffolk County district attorney election matched a white candidate (Malone) against a black candidate (Martin) for the single seat. Martin ran on the Republican ticket, but he ran as an incumbent (originally having been appointed to the position by a Republican governor). Despite the fact that Malone had the Democratic endorsement, Martin was the preferred candidate of both black and white voters. He won the election handily. This election was plainly dominated by an attractive, well-known incumbent whose appeal cut across racial lines. Consequently, we find the results of this election uninstructive for purposes of either the second or third Gingles precondition.

Taken in the ensemble, the results of these multi-race exogenous elections provide compelling evidence that, in the Boston area, African–Americans vote cohesively, yet the white majority votes sufficiently as a bloc to enable it, most of the time, to defeat black-preferred candidates.

---

13. There was a third candidate in the race (Sinnott), but he attracted little support. For all practical purposes, the contest amounted to a head-to-head battle between Jenkins and Conley.

14. We use the term "non-African-American vote" here because this is the data that was presented to us (in the form of a bivariate regression estimate). Notwithstanding the relative breadth of this category, we find the conclusion both reliable and probative of pervasive white support for Jenkins's opponents.

**3. _Single–Race Endogenous Elections._** Although we have concluded that, in general, the results of single-race endogenous elections are less probative than other available data, we believe that those results ought to be mined in hopes that they may yield nuggets of useful information about voting patterns in the Boston area. _Cf. Vecinos,_ 72 F.3d at 988 n. 8 (suggesting that "evidence exhumed from 'white only' elections may still be relevant in assessing the totality of the circumstances in a vote dilution case" prosecuted by Hispanics).

Of the nineteen elections in this category—which include not only white-versus-white and black-versus-black elections but also two elections that pitted white candidates against Hispanic candidates—only fourteen produced statistically valid estimates. Ten of these were general elections (and, thus, of little utility to us, for reasons previously explicated). Three of the remaining four (the 1998 and 1999 Democratic primaries in the 5th Suffolk House district and the 2000 Democratic primary in the 6th Suffolk House district) took place in majority black districts and, thus, cannot tell us very much about the third _Gingles_ precondition.

This winnowing process leaves only the 1994 Democratic primary in the 15th Suffolk House district. That election pitted two white candidates against one another. African–American voters preferred Brookins (who lost) and white voters preferred Fitzgerald (who prevailed). These tallies indicate the presence of both African–American political cohesion and legally significant white bloc voting.

**4. _Single–Race Exogenous Elections._** Finally, we have examined the results of one single-race exogenous election: the 2001 election for Boston City Council. In that contest, an Hispanic candidate (Arroyo) faced six white candidates for four at-large city council seats. Although Arroyo received 52.7% of the black vote and 65.6% of the Hispanic vote, he received only 19% of the non-minority vote. This placed him first among African–American and Hispanic voters, but only sixth among other voters. Arroyo lost the election.

The regression results indicate the presence of both cohesive African–American voting and white bloc voting staunch enough to defeat a black-preferred candidate. Despite these indications, however, we accord relatively little weight to this evidence because the contest was both single-race and exogenous.

**5. _Recapitulation._** The evidence rehearsed above, when evaluated in connection with the other evidence in this case, leads us to find that the plaintiffs have clearly and convincingly satisfied the second _Gingles_ precondition. The evidence establishes beyond peradventure that African–American voters in the Boston area are politically cohesive. The same evidence, taken as a whole, also suffices to show that white voters, who constitute a majority in most districts, vote sufficiently as a bloc to enable them, as a general rule, to defeat the black-preferred candidates. We find, therefore, that the plaintiffs also have satisfied the third _Gingles_ precondition.

**C. _Totality of the Circumstances._**

Although satisfaction of the _Gingles_ preconditions takes the plaintiffs a giant step closer to success on the merits, it does not take them to the finish line. We still must canvass the facts needed to bring the totality of the circumstances into proper perspective. _See Gingles,_ 478 U.S. at 79, 106 S.Ct. 2752 (instructing trial courts "to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality whether the political process is equally open to minority voters") (citation and internal quotation marks omitted). It

will, however, be the rare case in which plaintiffs meet the *Gingles* preconditions and yet fail on their section 2 claim due to the totality of the circumstances. *Vecinos,* 72 F.3d at 983; *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,* 4 F.3d 1103, 1135 (3d Cir.1993).

As would be expected, the relevant circumstances are those bearing upon whether African–American voters in the affected districts have the same opportunities as other voters to participate in the political process and elect representatives of their choice. Our canvass includes the factors identified in the Senate report, *see supra,* to the extent they are relevant here (a few are not). It also includes several environmental factors peculiar to this case.

■ One of the most revealing questions a court can ask in assessing the totality of the circumstances is whether the affected districts exhibit proportionality, that is, whether the number of majority minority districts is in proportion to the minority group's share of the relevant population. This is to be distinguished from proportional representation, which speaks to the number of minorities elected to office. Whereas proportionality (or the lack thereof) is consistent with the calculus that section 2 demands, "nothing in [section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b).

■ While a finding of proportionality does not create a safe harbor, it often may be an important indicium that minority voters have an equal opportunity, regardless of racial polarization, to participate in the political process and elect representatives of their choice. *See De Grandy,* 512 U.S. at 1017–20, 114 S.Ct. 2647. A finding of disproportionality may well point in the opposite direction. *Id.* at 1020 n. 17, 114 S.Ct. 2647.

The defendants insist that the Enacted Plan results in no worse than rough proportionality for African–American voters. They begin with the uncontroversial fact that the black population makes up somewhere between 20.36% and 22.07% of the relevant population, depending on whether one uses (i) VAP or CVAP figures, and (ii) the alone or combo method of racial identification. They then claim that Dr. Engstrom admitted that African–American voters have an opportunity to elect representatives of their choice in four of the seventeen House districts that lie either wholly or partially within Boston's city limits (the 5th, 6th, 7th, and 12th Suffolk districts). In an effort to inflate this figure, the defendants argue that minorities—African–Americans or Hispanics or some combination thereof—have ample opportunity to elect their preferred candidates in five additional loci (the 9th, 11th, 13th, 14th, and 15th Suffolk districts). This means, the defendants say, that nine of the seventeen districts—or 52.94%—are functionally equivalent to majority minority districts.

Despite the defendants' creative mathematics, we find this construct too clever by half. First and foremost, it rests on a questionable definition of proportionality. In determining which districts should be counted as "black districts" for the purposes of proportionality analysis, the defendants include both those districts in which African–Americans comprise over 50% of the relevant population and those districts in which black voters have a credible opportunity to elect representatives of their choice even though they do not make up the majority of the relevant population. They claim to find support for this mixing of black majority districts and black "opportunity districts" in *De Grandy*'s acknowledgment that "there are communities in which minority citizens are able to form coalitions with voters from other ra-

cial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice." *Id.* at 1020, 114 S.Ct. 2647.

The defendants are reading *De Grandy* through rose-colored glasses. The *De Grandy* Court provided an explicit definition of proportionality: " 'Proportionality' as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population." *Id.* at 1014 n. 11, 114 S.Ct. 2647. The Court's subsequent application of this definition eliminates any conceivable ambiguity in the term "majority-minority." In conducting its proportionality analysis, the Court counted *only* those districts with "a clear majority of black voters," and did not count a district in which black voters, although not a majority, had been "able to elect representatives of their choice with the aid of cross-over votes." *Id.* at 1023, 114 S.Ct. 2647. Consequently, *De Grandy* provides inadequate support for including "opportunity districts" in a proportionality calculation.

Second, the defendants take Dr. Engstrom's testimony out of context. To be sure, Dr. Engstrom identified four of the districts created by the Enacted Plan as "opportunity districts"—but he did not suggest that these either could or should comprise part of the gold standard for a proportionality analysis. In a contrary vein, he explained that a given district can simultaneously be an "opportunity district" for more than one racial group, and he maintained that, applying the defendants' standard evenhandedly, the Enacted Plan created a vastly disproportionate number of white "opportunity districts" (at least fifteen of the seventeen challenged districts could be so categorized). We believe that this is a valid criticism of the defendants' approach. In our judgment, their creative mathematics do not add up.

Let us be perfectly clear. We think that the incidence of influence or crossover districts bears on the totality of the circumstances, and we have considered them in that context. We deem it encouraging that African–American voters in Boston have enjoyed a modicum of success in electing candidates of their choice outside of majority black districts. This is some indication that Boston has made inroads in "dismantl[ing] the barriers that wall off racial groups and [in] replac[ing] those barriers with voting coalitions." *Vecinos,* 72 F.3d at 991. At the same time, however, we find it telling that the Enacted Plan provides for only one majority black district (three, if the combo method of racial identification is used). One district would be 5.9% of the relevant universe; three would be 17.6% of the relevant universe. Either way, the Enacted Plan fails to provide African–American voters with a proportional number of majority black districts.

The other side of the coin is that the Enacted Plan provides white voters with a number of majority white districts that exceeds proportionality. The Enacted Plan created twelve majority white districts, which is 70.6% of the relevant universe. According to 2000 census figures, whites hover around 55% of the VAP (the exact figure depends upon whether the alone or combo method of racial identification is used). On that basis, white voters should have between nine and ten majority white districts—not twelve.

Moving past proportionality, the plaintiffs make much of the procedures used by the Committee in drafting the new district lines. They claim that those procedures stifled minority input. The evidence shows that, unlike their counterparts in the Senate, the House members of the Committee consistently refused either to confer with community representatives or

to listen to minority group concerns about the redistricting process. Petrolati himself chose to meet only with House incumbents and staff in regard to redistricting matters, and he advised other Committee members to follow suit. Whatever the shortcomings of this approach, we do not count it in the plaintiffs' favor. For one thing, the Committee did hold five public hearings. For another thing, its policy of not listening to community representatives in private, focused meetings appears to have been applied without regard to race.

We have also reviewed a number of other factors. The legislative history of the VRA suggests that courts should consider, in the course of a section 2 inquiry, "the extent to which members of the minority group have been elected to public office in the jurisdiction." S.Rep. No. 97–417, at 29 (1982), *reprinted in 1982* U.S.C.C.A.N. at 207. In Suffolk County, African–Americans have been elected regularly to various offices (including the House of Representatives) over the past twenty-five years. At the same time, however, a considerable number of African–American officeholders have come from heavily black districts, and the number of successful black candidates is disproportionately low when compared with African–Americans' share of Boston's population at the relevant times. Since this evidence cuts both ways, we deem it neutral for present purposes.

Consistent with the Senate report, we have tried to gauge "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Id.* The plaintiffs provided some testimony that African–American voters find Massachusetts legislators unaware of their concerns and unresponsive to their needs, but the defendants countered with evidence of instances in which legislators sought out minority groups and instituted programs designed to address the groups' requests. The evidence, as a whole, suggests that Massachusetts legislators are generally responsive to the particularized needs of minorities.

We have not limited our assessment of the totality of the circumstances to those factors recounted above. We have also inquired into causation where appropriate and examined such things as voter registration and turnout figures, the history of official discrimination at the polls in Boston, the playing of the race card in political campaigns, and the extent to which the effects of past discrimination in education and employment bear on the equities. These factors do not add substantially to our understanding of the totality of the circumstances.

We have left for last a final factor, to which we attach great importance. After having heard the testimony and reviewed the evidence, we find that incumbency protection played a significant role in the Committee's redistricting decisions. Incumbency protection is as old as electoral politics and, in its traditional form, is often thought to be a legitimate consideration in redistricting. *See, e.g., Easley v. Cromartie,* 532 U.S. 234, 247–48, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001); *Vera,* 517 U.S. at 965, 116 S.Ct. 1941. The issue becomes more complex, however, when race is used as a tool to achieve incumbency protection. *See Vera,* 517 U.S. at 968, 116 S.Ct. 1941 ("[T]o the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation."); *Clark v. Putnam County,* 293 F.3d 1261, 1271–72 (11th Cir.2002) ("Incumbency protection achieved by using race as a proxy is evidence of racial gerrymandering."); *Ketchum v. Byrne,* 740 F.2d 1398, 1408 (7th Cir.1984) ("We think there is little point for present purposes in distinguishing discrimination based on an ulti-

mate objective of keeping certain incumbent whites in office from discrimination borne of pure racial animus."). Here, the Committee made African–American incumbents less vulnerable by adding black voters to their districts and made white incumbents less vulnerable by keeping their districts as "white" as possible. Its actions evinced a willingness to move district lines simply to safeguard incumbents' seats, without regard to other objectives. This course of conduct sacrificed racial fairness to the voters on the altar of incumbency protection. *See generally Garza v. County of Los Angeles*, 918 F.2d 763, 778–79 (9th Cir.1990) (Kozinski, J., concurring and dissenting in part) (noting that "[p]rotecting incumbency and safeguarding the voting rights of minorities are purposes often at war with each other"). That sacrifice lends considerable luster to the plaintiffs' case.

This phenomenon is best illustrated by looking at how the Committee went about the task of fashioning the 6th, 11th, and 12th Suffolk districts. The Enacted Plan stripped three majority black precincts from the 11th and three more from the 12th. Rather than move these six precincts into districts where their presence might increase African–American opportunities, the House chose instead to place them in the 6th Suffolk—a district that already was two-thirds black under the 1993 Plan. The one-person, one-vote requirement plainly did not dictate these changes as the 11th and 12th Suffolk districts needed more people (not fewer) to accommodate the 2000 census whereas the 6th Suffolk did not. As a result of this superpacking of the 6th Suffolk, the black VAP in the 12th Suffolk (Speaker Finneran's district) was significantly reduced and the 11th Suffolk was converted from a majority minority district to a majority white district. We agree with Dr. Engstrom that this manipulation of district lines comprises a textbook case of packing,

which resulted in concentrating large numbers of minority voters within a relatively small number of districts.

To make a bad situation worse, the House leadership knew what it was doing. Speaker Finneran admitted that the 6th Suffolk was a "safe" majority black district before the six new precincts were transferred to it. For his part, Chairman Petrolati testified that he was aware of the exceedingly high concentration of African–American voters in the 6th Suffolk district prior to the release of the Committee Plan, but that he could not recall having investigated any alternative ways in which to draw the lines so as to "unpack" the district. When asked why the Committee had configured the 6th Suffolk as it did, neither Finneran nor Petrolati could give an exonerative reason.

We understand that legislatures have wide discretion to decide how best to ensure equal voting opportunities. *Georgia v. Ashcroft*, 123 S.Ct. at 2511. We also understand that packing is a loose concept that has no talismanic legal significance. *Cf. Voinovich*, 507 U.S. at 155, 113 S.Ct. 1149 ("Section 2 contains no *per se* prohibitions against particular types of districts ...."). But the VRA prohibits the creation of minority-concentrated districts if the effect of so high a degree of concentration is to deny members of a protected class an equal opportunity to participate in the political process and elect candidates of their choice. *See Gingles*, 478 U.S. at 46 n. 11, 106 S.Ct. 2752 (recognizing that "[d]ilution of racial minority group voting strength may be caused by ... the concentration of blacks into districts where they constitute an excessive majority"). In this instance, we believe that the extreme and unexplained packing of the 6th Suffolk district speaks eloquently to the totality of the circumstances. So too the unnecessary (and never convincingly explained)

stripping of minority voters out of the 11th and 12th Suffolk districts. *Cf. Ketchum,* 740 F.2d at 1407 (finding "strong evidence of intentional discrimination" in a city council's decision to move African–American persons out of particular wards "in much greater numbers than their proportion of the population and in greater numbers than required to accomplish the necessary reduction").

In the same vein, we find the circumstances surrounding the Fitzgerald Amendment revealing. Those circumstances show that the House was comfortable with manipulating district lines to benefit two white incumbents without pausing to investigate the consequences of its actions for minority voting opportunities. Once again, race was used as a tool to ensure the protection of incumbents. This sad fact speaks to the totality of the circumstances.[15]

We also deem it significant that, despite a growing African–American population, the Enacted Plan represents a step back from the previous redistricting scheme (enacted in 1993). Credible evidence of record shows that the 1993 plan provided eleven majority white districts and four majority black districts in the Boston area.

From 1990 to 2000, the black VAP grew as a percentage of the city-wide VAP by 0.3% and the white VAP shrank by 7.55% as a percentage of the city-wide VAP. We find that, despite these shifts in population, the Enacted Plan increased the number of majority white districts to twelve and diminished the number of majority black districts to one. Even were we to use the defendants' numerics—which we consider less accurate—the 1993 scheme provided eleven majority white districts and four

majority black districts whereas the Enacted Plan increased the number of majority white districts to twelve but decreased the number of majority black districts to three. However they are arrayed, these figures are disturbing, especially given the professed desire of the Committee to preserve or enhance minority voting opportunities. In the face of a burgeoning minority population, this sort of retrogression counts in the plaintiffs' favor. *Cf. id.* at 1407 (finding such retrogression to be "strong evidence of intentional discrimination").

In the end, we conclude that the calculated manipulation of the 6th, 11th, and 12th Suffolk districts, the reengineering associated with the Fitzgerald Amendment, and the regressive nature of the Enacted Plan collectively exhibit a willingness on the part of the House to use race as a proxy in achieving incumbency protection. This evidence weighs heavily in the plaintiffs' favor in a consideration of the totality of the circumstances.

### D. *Synthesis.*

In 1995, the court of appeals described the Voting Rights Act as "a Serbonian bog in which plaintiffs and defendants, pundits and policymakers, judges and justices find themselves bemired." *Vecinos,* 72 F.3d at 977. A decade later, this characterization still rings true. Voting rights cases are among the most difficult a court must decide. Not only do they implicate the complex relationship between race and politics, but they also plunge courts into the uncomfortable worlds of statistical analysis and legislative policymaking.

Our duty, however, is clear, and a careful review of the credible evidence in this

---

**15.** In an effort to parry this thrust, the defendants point out that, in the 2002 elections, an Hispanic candidate (Jeffrey Sanchez) won the 15th Suffolk seat. While that is so, the analysis performed by the defendants' expert failed to produce a valid regression estimate for the African–American vote in this election. Thus, we cannot say—as the defendants would have it—that Sanchez was the black voters' candidate of choice.

case leads inexorably to the conclusion that the Redistricting Act, insofar as it delineates the seventeen Boston-area House districts at issue, dilutes the voting power of African–American voters and, thus, offends section 2 of the VRA. The plaintiffs have carried the devoir of persuasion anent each of the three preconditions laid down by the Supreme Court, and an analysis of the totality of the circumstances confirms the presumption of impermissible vote dilution. In this regard, we attach particular significance to the evidence concerning proportionality, retrogression, and the House's willingness to turn a blind eye to the racial implications of its single-minded effort to protect incumbents at virtually any social cost.[16]

The short of it is that the plaintiffs have sustained their burden of demonstrating that the Enacted Plan leaves African–American citizens in the Boston area with "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). Consequently, the Enacted Plan cannot stand.

### E. *Remedy.*

This brings us to the question of remedy. We are mindful that 2004 is an election year and that time is of the essence. We are mindful too that plaintiffs' Plan No. 2, on its face, appears to be a viable surrogate for the portion of the Enacted Plan that we have found unlawful. It is tempting to impose Plan No. 2 on the Commonwealth, or in the alternative, to forge a plan of our own conception.

On balance, however, we think that there is a better way. In an ideal world, redistricting is a legislative prerogative, and we are hesitant to impose a remedy without first affording the Legislature an opportunity to act. *Cf. Vecinos,* 72 F.3d at

992 (recognizing that "it is a fundamental tenet of voting rights law that, time permitting, a federal court should defer in the first instance to an affected state's or city's choice among legally permissible remedies"). Moreover, we are cognizant that the movement of a single precinct may create a ripple effect felt several districts away. For these reasons, we will cede to the defendants the first chance to assemble a curative plan. The defendants must, of course, act with all deliberate speed. We believe that, given the extensive work already done and the availability of the Maptitude software, six weeks should be a sufficient period of time for the defendants to prepare a proposed redistricting plan, forward it to the plaintiffs for comment, and then submit it to us for approval. If the defendants fail to act within these temporal parameters, this court then must fashion an appropriate remedy.

In proceeding from this point, we remind the defendants that any new redistricting scheme must not rob Peter to pay Paul: a revised plan must afford all cognizable minority groups, not just African–Americans, an equal opportunity to participate in the political process and elect representatives of their choice. To this end, the Legislature should also take pains to avoid undermining cross-racial coalitions in the name of minority-district maximization. *See Shaw v. Reno,* 509 U.S. 630, 657, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (observing that "[r]acial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions"). We shall, of course, retain jurisdiction over this case pending the enactment of a lawful plan reconfiguring the seventeen affected districts.

---

**16.** Although we find these factors especially telling, we emphasize that, as noted above, a host of other circumstances also have influenced our decision.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we strike down the Enacted Plan insofar as it pertains to the seventeen House districts at issue here; enjoin the defendants from holding House elections for any of those seats under the Enacted Plan; and order the defendants to prepare and submit for our consideration, within six weeks from the date hereof, a new redistricting plan consistent with the requirements of section 2 of the VRA. We shall retain jurisdiction over the case pending the submission, approval, and enactment of a lawful redistricting plan.

*So Ordered.*

### APPENDIX A

**The First *Gingles* Precondition:**

**Majority Black Districts Using VAP**

*Alone Method:*

Under the Enacted Plan, the 6th Suffolk is 78.42% BVAP (black voting age population). Under Plan No. 2, the 6th Suffolk is 52.29% BVAP and the 12th Suffolk is 56.86% BVAP.

*Combined Method:*

Under the Enacted Plan, the 5th Suffolk is 55.93% BVAP, the 6th Suffolk is 82.42% BVAP, and the 12th Suffolk is 52.01% BVAP. Under Plan No. 2, the 5th Suffolk is 50.40% BVAP, the 6th Suffolk is 55.00% BVAP, the 11th Suffolk is 51.25% BVAP, and the 12th Suffolk is 60.50% BVAP.

### APPENDIX B

**The First *Gingles* Precondition:**

**Majority Black Districts Using CVAP**

*Alone Method:*

Under the Enacted Plan, the 5th Suffolk is 54.9% BCVAP (black citizen voting age population) and the 6th Suffolk is 81.1% BCVAP. Although neither party provided the court with complete CVAP data for Plan No. 2, we are satisfied with the plaintiffs' explanation (based on their modest alterations to the Harmon Plan) for why the 6th Suffolk, 11th Suffolk, and 12th Suffolk districts would have BCVAP figures exceeding 50% under Plan No. 2. The defendants did not seriously question this representation at trial.

*Combined Method:*

Under the Enacted Plan, the 5th Suffolk is 60.9% BCVAP and the 6th Suffolk is 84.8% BCVAP. Again, we are satisfied with the plaintiffs' explanation for why the 5th Suffolk, 6th Suffolk, 11th Suffolk, and 12th Suffolk districts would have BCVAP figures exceeding 50% under Plan No. 2.